# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BRENDA MULLINS, | ) |
| | ) |
| Plaintiff, | )     Case No. 05 C 2654 |
| | ) |
| v. | ) |
| | )     Magistrate Judge Jeffrey Cole |
| HALLMARK DATA SYSTEMS, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### I.
### INTRODUCTION

28 U.S.C. §1915(e)(2)(A) provides that "[t]he court *shall* dismiss the case at any time if the court determines that ... the allegation of poverty [in an *in forma pauperis* application] is untrue...." The statute leaves the judge with no choice. *Thomas v. Gen. Motors Acceptance Corp.,* 288 F.3d 305, 306 (7th Cir.2002); *Mathis v. N.Y. Life Insurance,* 133 F.3d 546, 547 (7th Cir.1998). The only discretion the court has is whether to dismiss the case with or without prejudice.[1] However, as Chief Judge Easterbrook has said in another, but not unrelated context, "[p]laintiffs who attempt to deceive federal judges... cannot expect favorable treatment on matters of discretion." *Campbell v. Clarke,* 481 F.3d 967 (7th Cir. 2007).

Ms. Mullins concedes that her *in forma pauperis* application and affidavit contained answers that incorrectly omitted information regarding almost $20,000 in salary and interests in certain real

---

[1] Prior to its amendment in 1996 in the Prison Litigation Reform Act and its recodification of §1915(d) at §1915(e), the court had discretion to dismiss. *Denton v. Hernandez,* 504 U.S. 25, 27 (1992). The 1996 amendment changed "may dismiss" to "shall dismiss."

property. She insists, however, that she meant not to mislead anyone; her excuses are many. The question is whether her explanations are credible or whether her IFP application was perjurious. *Thomas*, 288 F.3d at 306.

"The legal system offers many ways to deal with problems; perjury is not among them." *Escamilla v. Jungwirth,* 426 F.3d 868, 870 (7th Cir.2005). *Compare Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006)(Easterbrook, J.)(judicial estoppel raises the costs of lying thereby inducing debtors to be more truthful in their bankruptcy filings). Indeed, so uncompromising is the law's insistence that participants in judicial proceedings must be truthful, that even exclusionary rules designed to protect constitutional rights give way in the face of perjury. *See Harris v. New York,* 401 U.S. 222 (1971); *Walder v. United States,* 347 U.S. 62, 65 (1954). Perjury, Judge Posner has said, committed in the course of legal proceedings is a fraud on the court, and it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case." *Allen v. Chicago Transit Authority*, 317 F.3d 696, 703 (7th Cir. 2003). This is such a case.

## II.
## BACKGROUND
### A.
### Plaintiff's Complaint and *In Forma Pauperis* Applications

On May 4 and July 5, 2005, Ms. Mullins, filed two *pro se* complaints against Hallmark Data Systems, LLC; one alleging employment discrimination and the other retaliation. The earlier case was assigned to Judge Holderman. The July complaint was assigned to Judge Darrah. Along with each complaint, Ms. Mullins filed a Motion for Appointment of Counsel and an Application for Leave to Proceed *In Forma Pauperis.* (No. 05-2654, Dkt. # 5; No. 05-2658, Dkt. # 8). The applications required the completion of form financial affidavits designed for use by non-lawyers and which twice prominently warned the applicant that the answers were being given under the

2

penalty of perjury. The first warning appears on page 1 immediately before the first question. It provides that Ms. Mullins is "answer[ing] the following questions <u>under penalty of perjury</u>." (Underscoring in original). The second warning appears *immediately above* Ms. Mullins's signature. It is impossible to overlook. It states: "I declare under penalty of perjury that the above information is true and correct. I understand that pursuant to 28 U.S.C. §1915(e)(2)(A), the court shall dismiss this case at anytime if the court determines that my allegation of poverty is untrue."

In her form financial affidavits, Ms. Mullins swore that neither she, nor anyone else living at her address "own[ed] any real estate (houses, apartments, condominiums, cooperatives, two-flats, three-flats, etc.)." She also swore that, aside from the $1424 per month she was earning from her then current employer, she had not received more than $200 a month in salary or wages in the last year. In fact, Ms. Mullins was employed by Hallmark until November 12, 2004 and had earned almost $20,000 in that period.

Taking Ms. Mullins at her word, Judge Holderman granted Ms. Mullins's motion for the appointment of counsel, but ordered Ms. Mullins to pay the $250 filing fee before June 30, 2005. She did so. The case was later reassigned to Judge Kendall, who consolidated the discrimination and retaliation suits on April 13, 2006. At this point in the proceedings, I had been assigned to supervise discovery, which proceeded only haltingly. This was due, not to any fault of Ms. Mullins's appointed counsel, but her own lack of cooperation. (Dkt. # 32). It reached the point that Hallmark filed a motion to dismiss for failure to prosecute under Fed.R.Civ.P. 41(b). Thereafter, the parties consented to my jurisdiction, and the case was reassigned to me.

The truthfulness of Ms. Mullins's IFP answers was called into question when she filed for bankruptcy protection on April 8, 2006. (*In re Brenda Mullins*, No. 06-BK-3891). In her schedule

3

of assets, Ms. Mullins disclosed that she owned an interest in a single-family house located at 11935 South State Street in Chicago ("the State St. Property"). [2] (*Defendant's Memorandum to the Court*, Ex. A. This interest was not disclosed in her IFP applications.[3]

## B.
## The Motion to Dismiss Under Section 1915(e)(2)(A)

Shortly thereafter, Hallmark filed a Motion to Dismiss the complaint on the grounds that Ms. Mullins was untruthful in her IFP Affidavits regarding her lack of any property interest or income other than from her then-current employer.[4] Contrary to Ms. Mullins's denial of any real estate ownership, Hallmark attached exhibits consisting of the deed and four mortgages taken against a property located at 127 E. 119th Street in Chicago ("119th St. Property") – a property other than the State St. property revealed in Ms. Mullins's bankruptcy filings.[5] (*Memorandum in Support of Defendant's Motion to Dismiss*, Exs. A-E). In addition, Hallmark attached as exhibits copies of Ms. Mullins's 2003, 2004, and 2005 federal income tax returns, in which she claimed deductions for property tax and mortgage interest paid on the 119th St. property. (*Id.*, Exs. F-H). Finally Hallmark pointed out that Ms. Mullins had earned $19,500 in salary from it during the period in which she

---

[2] According to the Transcript of Proceedings from May 2, 2006, Ms. Mullins's father originally owned the house, and when he died intestate, Ms. Mullins and her four siblings inherited it. (Tr. at 13). The property has since gone into foreclosure. (Tr. at 13).

[3] While Ms. Mullins was forthcoming about the real estate interest in her bankruptcy filings, she concealed that she was suing Hallmark even though she was required to "[l]ist all suits . . . to which [she] . . . was a party within one year immediately preceding the filing of [the] bankruptcy case."

[4] The motion to dismiss likewise sought compensation for Hallmark's costs and attorney's fees. However, at the hearing on May 2, 2006, I expressed reservations that such relief could be granted. (Tr. at 17-18). Hallmark did not again request this relief in its Reply Memorandum in Support of Its Motion to Dismiss, instead only praying for dismissal with prejudice. (*Reply* at 7).

[5] At the time it filed its motion to dismiss, Hallmark was unaware that Ms. Mullins had an ownership interest in the State Street property. (Tr. at 12).

4

swore she had not earned more than $200.

In response, Ms. Mullins conceded that she "made three specific omissions on her initial IFP applications": the failure to disclose her interests in the 119th St. property; the failure to disclose her interest in the State St. property, and her failure to disclose almost $20,000 in income from Hallmark. (*Plaintiff's Response*, at 3-4). Ms. Mullins had a miscellany of excuses. Some were made in her affidavit in response to the motion to dismiss; others evolved at the evidentiary hearing on October 4, 2006, at which she was represented by counsel whom I had appointed for her for purposes of the hearing and responding to the motion to dismiss, her prior counsel having been given leave to withdraw.

Among the excuses were: Ms. Mullins did not think she had to disclose the $19,500 in income from Hallmark since Hallmark and/or the court knew what it paid her; she did not think she had to disclose the $19,500 because she did not have access to the money in May 2005 as all of it had been spent on household expenses; she thought she had to disclose the money since everyone should have known, and in any event, it was excludable by virtue of instructions from the Illinois Department of Unemployment Compensation; she was unaware of her property interests; she did not understand the simple questions on the IFP form; she did not read the questions very carefully; she was upset when she filled out the forms; she was "morally" convinced that she did not have an interest in one of the properties; she did not understand that she had an ownership interest in the properties even though she repeatedly took deductions relating to the 119th St. property on her federal income tax returns; she did not understand that being a mortgagor signified an ownership interest in property; and she did not have "complete ownership" in one of the properties and therefore did not think her fractional interest had to be disclosed and in any event the value of her share was small.

5

All of these *post hoc* justifications depend on Ms. Mullins's credibility. Making credibility judgments about anyone is often a tricky business. Demeanor can be an important component of the calculus. *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007); *Julian v. Bartley*, _F.3d_ 2007 WL 2121921. at *5 (7th Cir. 2007). *Cf. Uttecht v. Brown*, 127 S.Ct. 2218, 2223 (2007)(demeanor of jurors); *Rice v. Collins*, 546 U.S. 333, 343 (2006)(prosecutor's demeanor). Indeed, the demeanor of a witness may satisfy the trier of fact not only that the witness' testimony is not true, but that the truth is the opposite of his story. *See NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408 (1962); *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 575 (1985).[6] In the instant case, Ms. Mullins's overall demeanor was inconsistent with truthfulness. She was natural and relaxed when talking about routine and undisputed matters. Her demeanor changed markedly when pressed about the reasons for her exclusions on her IFP forms or when her explanations were in any way challenged. She then became annoyed, defensive, and defiant.

However, credibility involves more than demeanor. *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Indiana Metal Products v. NLRB,* 442 F.2d 46 (7th Cir.1971). Most important is the witness's testimony, which "is not a discrete, self-contained unit of evidence examined and weighed without context; it is a part of the body of evidence which is intertwined and considered in its totality.'" *Ayi v. Gonzales,* 460 F.3d 876, 881 (7th Cir.2006). The implausibility of testimony, the

---

[6] If Judge Posner is right, demeanor is overrated, and judges fool themselves if they think they can make meaningful credibility determinations upon what ultimately are intuitive guesses based perhaps more on a judge's background than some innate ability to divine the truth from a witness's body language and inflections. *See United States v. Wells,* 154 F.3d 412, 414 (7th Cir.1998); *Consolidation Services, Inc. v. KeyBank Nat. Ass'n,* 185 F.3d 817, 820 (7th Cir.1999); *United States v. Wells,* 154 F.3d 412, 414 (7th Cir.1998). Judge Easterbrook has come to the same conclusion and has said that demeanor "is a form of lie detector without the electrodes and graph paper." *Djedovic v. Gonzales,* 441 F.3d 547, 551 (7th Cir.2006). Despite these *dubitante* opinions, demeanor continues to be an accepted and important component of credibility determinations.

shifting and vacillating explanations for conduct, the inconsistencies between testimony and objective evidence, and the internal inconsistencies within testimony may be so great that no reasonable fact-finder would credit it. *See United States v. Bradford*, 2007 WL 2403756 at \*6 (8th Cir. 2007); *Pinpoint, Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.)(sitting by designation). *Cf. NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1268 (7th Cir. 1987); *Miller-El v. Dretke*, 545 U.S. 231, 237 (2005).[7]

Perhaps the most important aspect of the context in which the plausibility of Ms. Mullins's explanations must be assessed is her background. Ms. Mullins is a sophisticated, knowledgeable and highly educated woman. She attended three years of college, majoring in mathematics, and she earned an associate's degree. She was two hours short of a degree. She successfully took courses in algebra, trigonometry, geometry, calculus, chemistry, English, and computer science. She was an account manager at Hallmark. *(Tr.* 57-59).[8] In May, 2004, about a year before she filed her IFP applications, Ms. Mullins was planning to build a home in South Bend, Indiana. *(Tr.*, 100). She worked with the builder on the design of the house and personally negotiated the prices of the various phases of its construction, the construction loan, the mortgage loan commitment and the residential loan application. *(Tr.*, 100-103; *Hearing Ex.* O).[9] Her loan application was approved for \$160,000. It is against this background that Ms. Mullins's testimony must be assessed.

---

[7] Indeed, where such factors are present, a court of appeals can find clear error in a finding of credibility based on demeanor, even though such determinations are, as a matter of practice, usually insulated from appellate review. *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260, 263 (7th Cir.1986).

[8] From this point forward, Tr. refers to the transcript of the hearing on October 4, 2006.

[9] As it turned out, however, she lost her job and the plans fell through.

7

# III.
# ANALYSIS

## A.
## Ms. Mullins's Failure To Disclose $19,500 In Wages On Her IFP Forms

Question 3 of the IFP form asks:

Apart from your income stated above in response to Question 2, in the past twelve
months have you or anyone else living at the same address received more than $200
from any of the following sources?
a. Salary or wages?

Despite having received almost $20,000 from Hallmark in the period specified in the form,
(*Plaintiff's Response*, Ex. A, Mullins Aff., ¶5), Ms. Mullins answered, "no" in both of her IFP
applications. She says she did not think she had to list her wages from Hallmark because the
lawsuits she filed were against it, it was an employment case and thus the judge must have known
she had income from Hallmark, although she conceded that nothing in the forms justified the gloss
she put on them. More importantly she conceded she knew the form was to inform the court of her
financial status. Hence, Hallmark's knowledge was besides the point.

She also contended that she was confused by the Illinois Department of Employment Security
forms she filled out for unemployment compensation. Since, she says, these forms allowed her to
exclude the $19,500 she earned from Hallmark, it followed – to her way of thinking – she could keep
it from Judge Holderman as well. (*Mullins Aff.*, ¶2). Ms. Mullins did not provide a copy of these
forms to support her story. Little wonder. Apart from its manifest illogic, the untruthfulness of the
excuse is apparent when one looks to the pamphlet entitled "What Every Worker Should Know
About Unemployment Insurance," which is distributed by the Illinois Department of Employment
Security (IDES). The document is available on the Department's official website.

The pamphlet says that applicants for unemployment are to bring to the IDES office "records showing wages earned, including dismissal wages and vacation pay." That would necessarily include wage and pay information from the employer that dismissed the applicant -- in this instance, Hallmark. Nothing in the pamphlet suggests that wages earned in the past 12 months do not count. Moreover, the Unemployment Insurance Application says, "If you worked this week, please enter your <u>gross pay</u> (hours worked x hourly pay)." (Underscoring in original). (*See* http://www.ides.state.il.us/forms/default.asp#worker). The IFP application is a different form, completed in a different place, as part of a different process, with obviously very different t purposes. The IFP application asks for salary earning during the previous 12 months, not the previous week. In short, there is no support for Ms. Mullins's explanation that she confused one form with another.

Perhaps perceiving the unconvincing nature of her story, Ms. Mullins nimbly switched positions at the October hearing. She then claimed that she excluded the almost $20,000 in salary because everyone knew about it. Her explanation went like this:

> . . . when I was filling out this [IFP] paperwork, I am reading the questions. And I am doing these cases simultaneously at the same time. And I'm thinking, okay, I filed a claim against Hallmark. So everyone *should be aware* that I was working there *and I had an income*. So –
>
> \*       \*       \*
>
> . . . it read to me that it *should be any job other than Hallmark* as the other information I was filling out. So prior – other than – anything that I had – any job that I had held for the past 12 months other than Hallmark. So that's why it was left blank, not intentionally to, you know, leave it off to say I didn't have any income. But I didn't have any . . . income other than Hallmark.

(*Tr.*, 74)(Emphasis supplied). The theory is not a convincing one, and even Ms. Mullins had to admit that there was nothing in the question that would have led her to believe she should have excluded $19,5000 in income from Hallmark. In fact, she testified that the question was clear. (*Tr.*,

9

75-77). Later, she would variously claim that she did not read the form very carefully, did not understand the questions and was upset when she filled out the forms. Apart from their obviously desperate quality, the excuses failed to note the passage of time between the first and second IFP applications.

Moreover, an "aware[ness]" on the part of the reader of the forms that she had income would not give the reader any idea of the amount. Yet, that was the critical inquiry, as Ms. Mullins was forced to concede. Finally, she conceded that she also understood that if she listed more salary or wages on the IFP forms, it might have a negative impact on whether a judge appointed her counsel for her. (*Tr.*, 83). But, Ms. Mullins had a backup excuse. This one was even more contrived. She said that she did not list the income on the IFP forms because she "did not have access to it in May 2005 as all of it had been spent on household expenses." (Mullins Aff., ¶ 5). As Justice Holmes said in a different context, this is a construction (of the IFP forms) that is not interpretation but perversion. *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 106 (1917). Under Ms. Mullins's perverse view, the form would have no utility since the very people who were most in need of appointed counsel would of course have spent their salary as it was earned. As Ms. Mullins would have it, if the IFP applicant earned $1 million in the preceding 12 months and spent it all, she would be entitled to have the taxpayers foot the bill for legal representation since she had no access to it.

These "shifting explanations. . .undermine[ ] [Ms. Mullins's] credibility. . . ." *NLRB*, 883 F.2d at 1268. *See, e.g., Ryder Truck Rental v. NLRB*, 401 F.3d 815, 827 (7th Cir.2005); *Bailey v. United States*, 1997 WL 759654 at *35 (Fed.Cl.1997); *United States v. Nixon*, 881 F.2d 1305, 1309 (5th Cir.1989). Moreover, in light of Ms. Mullins's background, the explanations are inherently incredible. Ms. Mullins's purported confusion over the unemployment forms and the IFP forms and

what she thought everyone knew was a purposeful fabrication designed to conceal the intentional falsity of the answer to Question 3 on the IFP forms. The inescapable reality is that Ms. Mullins lied about her income in the twelve-month period preceding her IFP applications to deceive the judges to whom they were addressed, and she continued to lie at the hearing. And these fabrications and Ms. Mullins's false hearing testimony also bear upon her credibility on the balance of her hearing testimony. Ms. Mullins's non-disclosure of the $19,500 is enough to warrant granting the defendant's motion. But there is more.

## B.
## Ms. Mullins's Failure to Disclose Her Property Ownership

Question 6 of the IFP form asks:

Do you or anyone else living at the same address own any real estate (houses, apartments, condominiums, cooperatives, two-flats, three-flats, etc.)?
Address of property:_____
Type of property:_____ Current value:_____
In whose name held:_____ Relationship to you:_____
Amount of monthly mortgage or loan payments:_____
Name of the person making payments:_____

Ms. Mullins answered "no," and left the remainder of the question blank. Like her answer to Question 3, this answer was false. Ms. Mullins owns a house at 127 E. 119th St. with her mother, Hertis McCoo. (*Memorandum in Support of Defendant's Motion to Dismiss*, Ex. A). She also has an interest in a house at 11935 S. State St., where she resides. (*Defendant's Memorandum to the Court*, Ex. A). Her excuses for failing to list these interests in her IFP application are no more believable than her excuses for concealing the Hallmark salary.

### 1.

### The 119th St. Property

11

Ms. Mullins acknowledges that she is "listed as a co-owner"on the deed for the 119th St. Property, where her mother lives along with ten other family members. But she claims that it was her understanding that she was just a "co-signer on the loan for the property" and was unaware that her name was in fact on the deed as owner. (*Mullins Aff.*, ¶ 7; Defendant's Hearing Ex. A, August 1999 deed). She claimed that she never made a mortgage payment or paid any bills on the property, and as for her name on the four separate mortgages taken out on the property between 1999 and June 2004, she contended that she simply signed her name at her mother's request. (*Mullins Aff.*, ¶ 9; Defendant's Hearing Exs. B-E, Mortgages of September 1999, November 2001, November 2003 and June 2004). And if that is not enough to justify her answers to Question 6, Ms. Mullins adds that the property has little value – it is worth perhaps $100,000 and is encumbered by a $91,000 mortgage. Apparently, the point is her $2,000 share of the property is so minimal that is was okay to exclude it on the IPF form – although she does not quite say this directly. (Mullins Aff., ¶¶ 10-11). Among the many difficulties with this excuse is that it is dependent upon Ms. Mullins's word, which I decline to credit. *Cf., Mathis*, 1996 WL 473430, *2 (rejecting similar excuse).

Apparently most important to Ms. Mullins is her "moral" assessment of the situation. She claims that although she knows she is legally co-owner, "morally [she] has no right to claim anything from this property because it is [her] mother's residence and she paid for it." (Mullins Aff., ¶¶ 11(d), 12). Ms. Mullins has "never considered this property to be [hers]", and does "not believe that [she has] a financial stake in it at all." (Mullins Aff., ¶¶ 12). This was her story at the hearing also.

The IFP application does not ask whether someone feels they have a moral right to an ownership interest in property. It asks whether the applicant owns any real estate. The pretextual nature of Ms. Mullins's testimony regarding the 119th St. property is evidenced by her 2003 income

12

tax return, which reflects approximately $10,000 in deductions for mortgage interest and real estate taxes paid on that property. (*Memorandum in Support of Defendant's Motion to Dismiss*, Exs. F, G, H; Tr. 11-12). She explained that she did so at her mother's request, even though she claims that she never paid mortgage interest or real estate taxes on the property. (*Tr.*, 12-13).

Shc also identified the property as her residence on the returns, although she now claims she has never lived there. (*Memorandum in Support of Defendant's Motion to Dismiss*, Ex. F, at 2; Tr. 14). She insisted she was told to do this by her tax preparer, Jackson-Hewitt.[10] Later in her testimony, she would inconsistently claim that she had no discussion with her tax preparer in 2003 or 2004 regarding her return. She took the same deductions for mortgage interest and real estate taxes on the 119th St. Property on her income tax returns for 2001, 2002, and 2004, as well as on her 2003 return. (*Memorandum in Support of Defendant's Motion to Dismiss*, Ex. G; Tr. 17). All of these returns were prepared under the penalty of perjury. Although initially evasive, Ms. Mullins grudgingly was forced to concede that she did not think it was permissible to lie to the IRS. (Tr.14). Yet, if her trial testimony that she never made the payments is to be credited, that is exactly what she did. She attempted to evade the effect of this inconsistency by claiming that she never read the returns – the inference apparently being that she did not know the deductions were being taken. That excuse is obviously inconsistent with the "tax preparer told me to do it" excuse. Both are palpably and knowingly false, and in any event, meaningless since it was she who gave the information to her

_____

[10] (Tr 13-14, 54). But it was she who provided the information to her tax preparer, including the information that the 119th St. Property was her residence. (*Memorandum in Support of Defendant's Motion to Dismiss*, Ex. F, at 2; Tr. 14-15). And she did not bother to tell the tax preparer that she was not making mortgage or tax payments. (Tr., 55). Reliance on a tax advisor requires that the taxpayer make full disclosure of all pertinent facts. *McGraw v. CIR*, 384 F.3d 965, 973 (8th Cir. 2004).

13

tax preparer. (Tr. 22).[11]

At other points in her testimony, Ms. Mullins tried to say that while she understood what a deduction was, she did not know how it would affect any refunds. Finally, she conceded that she "figured [the deductions she took] it would probably have an impact on the amount that [she] receive[d] back." (Tr. 60-61). When she got tax refund checks, she fully realized that a portion of those were attributable to the deductions she took. Yet, she continued to take the deductions even though she now insists she never made the payments and she never contacted Jackson-Hewitt and told it that the deductions were not properly hers.[12]

At the hearing, Ms. Mullins initially testified that when she read the perjury warning on the IFP applications she did not "truly" understand what it meant. (Tr. 27). But, upon further questioning, she conceded that she did in fact know what it meant: that she "was not supposed to lie in [the] document." (Tr. 28). To account for this contradiction, she changed her testimony and claimed that it was "things in the document" that she did not understand, as opposed to the perjury warning. (Tr. 29).

In the end, Ms. Mullins grudgingly admitted that she realized that the IFP applications were

---

[11] Obviously, Jackson-Hewitt could not have made up the information, and it could not possibly have known how much to deduct for the mortgage and taxes without Ms. Mullins's input.

[12] Ms. Mullins's testimony is susceptible to one of two interpretations: either she fraudulently took deductions to which she knew she was not entitled or she lied at the hearing about ownership of the property. Either way, Ms. Mullins does not fare well. Lying under oath outside the particular proceeding is a persuasive datum that a witness' testimony in that proceeding is not credible. *United States v. Maya-Azua,* 30 F.3d 140 (9th Cir.1993)(unpublished decision, 1994 WL 319132 at *2; *United States v. Boyd,* 833 F.Supp. 1277, 1347 (N.D.Ill.1993). *Compare United States v. Dawson,* 434 F.3d 956, 957 (7th Cir.2006)(Posner, J.); *Alsagladi v. Gonzales,* 450 F.3d 700, 701 (7th Cir. 2006)(". . .someone who concedes willingness to lie in order to obtain residence in this nation (as Alsagladi does) may well be trying to pull the wool over the agency's eyes in support of his application for asylum as well as in his application for a visa."). Conversely, if her deductions were legitimate, as she swore in her tax returns they were, then she lied under oath on her IFP forms regarding her absence of any ownership in real estate.

14

designed to elicit a comprehensive understanding of her financial situation for the court. (Tr. 36). That they did not fulfill their intended purpose is attributable to Ms. Mullins's mendacity.

## 2.
## The State St. Property

Ms. Mullins testified that she lived at the State St. property since her father purchased it eleven years ago. (Mullins Aff., ¶ 14 ). Her father died intestate in April 2003, and Ms. Mullins and her four siblings inherited the house. (*Plaintiff's Response*, at 5; Mullins Aff., ¶ 17). She said that upon her father's death, she "contacted the mortgage company and found out that [she] had no legal claim for *full* ownership of this property." (Mullins Aff., ¶ 17 (Emphasis supplied)). No one applied to be executor of her father's estate, and title remained in her father's name. (*Plaintiff's Response*, at 5; Mullins Aff., ¶ 20). Ms. Mullins paid the mortgage and bills on the property since her father purchased it. (Mullins Aff., ¶ 16; Tr. 53).

By the time she found work after her termination at Hallmark, foreclosure proceedings had begun. (Mullins Aff., ¶ 19). She filed for Chapter 13 Bankruptcy so she could set up a payment plan to get the house out of foreclosure. (Mullins Aff., ¶ 21). As with the 119th St. Property, Ms. Mullins claimed that even if she could somehow liquidate her interest in the State St. property, she would realize little gain    perhaps $2000. (Mullins Aff., ¶ 23). She claimed the house is worth $90,000, requires $20,000 in repairs to make it marketable, and is encumbered by a $55,000 mortgage. (Mullins Aff., ¶ 22).[15] And as with the 119th St. Property, Ms. Mullins provided no independent support for her claims about the property's value.

At the hearing, Ms. Mullins admitted that when her father died, she knew that she had a

---

[14] Ms. Mullins's claimed level of knowledge in this area is in marked contrast to her claimed lack of understanding about tax returns and deductions.

15

partial interest in the State St. Property. (Tr. 21, 32-36, 90). She testified that she knew about this interest since May of 2003 when she had a conversation with a real estate lawyer. (Tr. 90). She even listed the property on her schedule of assets when she filed for bankruptcy in April of 2006 (Tr. 43-44) although she accounted for this inclusion by saying that she never reviewed the bankruptcy petition or discussed it with her lawyer. This is the same kind of evasion she employed when discussing the deductions on her tax returns. How her bankruptcy counsel could possibly have obtained the information except from her was not explained any more than was the method by which Jackson-Hewitt, her tax preparer, learned of the information included in her tax returns.

Not surprisingly, Ms. Mullins, although represented by counsel at the time, did not bother to amend her IFP application until after Hallmark filed its motion to dismiss. "[I]f [Ms. Mullins] were really making an honest attempt [to be truthful] then as soon as she realized that [her IFP forms were inaccurate] she would have filed amended [IFP forms]. . . ." *Cannon-Stokes v. Potter,* 453 F.3d 446, 448 (7th Cir. 2006)(Easterbrook, J.). Honesty of purpose prompts frankness of statement. Concealment is indicative of fraud. *Crosby v. Buchanan,* 90 U.S. 420, 454 (1875). In Ms. Mullins's moral universe, she is without fault. It is everyone else who must bear the responsibility for her "misunderstandings." She has noted that the three district judges who were previously involved in this never made any inquiry about her financial representations. (Plaintiff's Response at 2; Tr. 95). If the intent is not obliquely to somehow cast blame on the district court, the observation has no point. That they did not make inquiry only demonstrates that Ms. Mullins's fraud was successful.[14]

To Ms. Mullins's way of thinking, because she did not have *full* ownership in the State St.

---

[14] It surely was not for Judge Darrah, Judge Holderman, or Judge Kendall to assume the untruthfulness of the IFP applications and to conduct a *sua sponte* investigation. Their failure to have done so proves only that Ms. Mullins was successful in having gulled them, not that her statements were true.

16

property, she did not understand that she was required to list the partial ownership interest on her IFP application. The pretextual nature of this excuse is apparent. Ms. Mullins listed the automobile she jointly owned with her husband, thus manifesting her understanding of the concept of joint ownership and the need to list that interest no matter how small – the car was valued at just $2000. (Tr. 85, 87-88). Ms. Mullins explained that:

[t]he house on 11935 South State Street, that was a house where my name was never on the deed or anything to that property. So when my father passing, it still isn't. So there is no ownership there.
(Tr.. 86).

Ms. Mullins's claimed test of ownership is not credible. She disclosed her joint ownership of a used car, with minimal value, but concealed joint ownership of realty with a value at least equal to that of her used car. For Ms. Mullins, the fact that her name was not on the deed to the State Street property is claimed to have led her not to disclose her interest in that property. One would assume then that the presence of her name on a deed would lead her to disclose that interest. But her interest in the 119th St. property was concealed as well. (Tr. 35-36). Even the repeated deductions on her tax returns for taxes and mortgage interest were not enough for Ms. Mullins to disclose any interest in the realty that underlay her deductions.

Ms. Mullins has many and varied explanations. When they are considered together and are considered in the overall context of the case, all have a hollow ring, and all are incredible.

## C.
## Not To Dismiss Ms. Mullins's Complaint With
## Prejudice Would Be An Abuse Of Discretion

"The soundness of a conclusion may not infrequently be tested by its consequences." Posner, Cardozo: A Study in Reputation, 118 (1990). In the instant case, the consequence of dismissing Ms. Mullins's case without prejudice – as she demands – would subvert the goals Congress sought to

17

achieve in §1915 and would encourage perjury. As Judge Posner has explained, where one attempts to "defraud the government" with a perjurious IFP affidavit, dismissal with prejudice may be the only effective sanction:

> Dismissal with prejudice may have been the only feasible sanction for this perjury designed to defraud the government. Dismissal without prejudice would have been no sanction at all, unless perchance the statute of limitations had run in the interim, which it must not have done or the plaintiff would not be complaining about the fact that his suit was dismissed with prejudice. And a monetary sanction would probably be difficult to collect from a litigant assiduous in concealing assets. Even dismissal with prejudice wouldn't be much of a sanction unless the plaintiff's suit was a winner, or at least had some settlement value, which it may not have had.

288 F.3d at 306-07.

A dismissal without prejudice would allow Ms. Mullins to refile her complaint. Her gamble with the false IFP affidavit would have paid off. She would be left in no worse position than if she had told the truth on the form. For plaintiffs like Ms. Mullins who intentionally defraud the government, the IFP application process would be a roll of the dice. If the subterfuge went undetected, the applicant would have a free lawyer. If it did not, there would be no sanction, for the case would simply continue. This sort of heads I win, tails you lose approach is unacceptable in all contexts. *Compare FEC v. Wisconsin Right to Life, Inc.*, 127 S.Ct. 2652, 2668 (2007); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 318 (1985); *Kaskel v. Northern Trust Co.*, 328 F.3d 358, 360 (7th Cir. 2003).

Of course, since mistakes are inherent in the human condition, it would be inappropriate to dismiss a suit with prejudice where the untruthfulness of the allegations in the IFP application were the result of good faith error. However, to dismiss without prejudice where an applicant intentionally lies on an IFP form would encourage the very perjury Congress sought to deter in §1915. A dismissal with prejudice in that context is consistent with the doctrine of proportionality,

18

which applies here no less than in other contexts. *Allen*, 317 F.3d at 703.

It is true as Ms. Mullins argues that *Allen v. CTA*, noted that "dismissal as a sanction under Section 1915(e) may not be appropriate under circumstances where the alleged perjury 'was clumsily committed and quickly discovered.'" (*Response* at 8). However, *Allen* did not involve §1915. The question there was whether the failure to pay a fine as a sanction for perjury *mandated* dismissal. Judge Posner concluded that it did not, because the district court made no finding of willfulness. Judge Posner went on to say that "[a] willful failure to pay fees due in the trial court where fines or other monetary sanctions imposed by that court strikes us as a reasonable ground for dismiss[al]. . . ." 317 F.3d at 702. Moreover, the perjury here was not clumsily committed or quickly discovered. Quite the contrary, Ms. Mullins has done all in her power to continue to mislead and obstruct the court, even after the truth was discovered.

Civil litigants have no constitutional or statutory right to counsel; whether a civil litigant may have counsel appointed is a matter left to the district court's discretion. *See Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir.2006). *See also* 28 U.S.C. § 1915(e)(1) ("The court *may* request an attorney to represent any person unable to afford counsel.")(Emphasis supplied). The appointment of counsel is a privilege that Ms. Mullins has badly abused. And like the attorney-client privilege, which when abused vanishes, *Clark v. United States*, 289 U.S. 1, 16 (1933)(Cardozo, J.), the privilege of having appointed counsel vanishes when abused by having been obtained by fraud.[15]

If Ms. Mullins's argument is that dismissal with prejudice cannot occur even in cases of

---

[15] This result is consistent with Ms. Mullins's own analysis, which argues that §1915(e) is designed to weed out litigants who falsely understate their net worth in order to obtain IFP status when they are not entitled to it; not to punish those who in good faith misstate their net worth. (*Plaintiff's Response*, at 6-7, 10, citing *Lee v. McDonald's Corp.*, 231 F.3d 456, 459 (8th Cir. 1990) and *Moreland v. Hu-Friedy Mfg. Co.*, 1997 U.S. Dist. Lexis 13180 (N.D.Ill. 1997), both of which hold that knowingly false misrepresentations in IFP applications are a proper basis for a dismissal with prejudice).

19

intentional misrepresentations on the IFP form, so long as in the end the applicant is actually impoverished, it is an argument that has no support either in the text, the legislative history, or the cases construing §1915. It would accord to *in forma pauperis* applicants a right to lie and in practical application would negate the 1996 amendment to §1915.

The cases from the Eleventh Circuit cited by Ms. Mullins do not support a right to lie thesis. (*Plaintiff's Response*, at 6). They were decided before the recodification of §1915(d) at §1915(e) removed the judge's discretion as to whether to dismiss a complaint. Moreover, the Eleventh Circuit has upheld dismissal of claims of litigants who were arguably indigent. *Dawson v. Lennon*, 797 F.2d 934, 935 (11th Cir. 1986); *Collier v. Reigio*, 760 F.2d 279 (11th Cir.1985). And where bad faith is shown, the Eleventh Circuit has not hesitated to sanction dismissals with prejudice. *See Matthews v. Gaither*, 902 F.2d 877, 881 (11th Cir. 1990).

In *In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama on September 22, 1993*, 29 Fed.Appx. 575 (11th Cir. 2001)(table no. 01-12190), the Eleventh Circuit upheld the district court's dismissal with prejudice where the plaintiff had filed perjurious answers to interrogatories. The district court concluded and the Eleventh Circuit agreed that Eleventh Circuit precedent had reaffirmed time and again the strong interest that a court has in preventing abusive and fraudulent conduct. 136 F.Supp.2d at 1265 (S.D.Ala. 2001). While *In re: Amtrak* involved a court's discretionary authority under Rules 11, 37, and 41(b), Federal Rules of Civil Procedure, and the inherent power of the court, the case underscores the Eleventh Circuit's refusal to countenance perjury and to uphold district court's discretionary dismissal of a case with prejudice where that has occurred.

In *Mathis v. New York Life Ins. Co.*, 1996 WL 473430, at *1 (N.D.Ill. 1996), the applicant

omitted a property interest worth about $7500, explaining that he did not know how to include it in the application because it was subject to liens. Despite the fact that he was unemployed, had a car worth just $500 and only $300 in his bank account, and was "'barely' able to live and avoid foreclosure on his home," the district court dismissed the case with prejudice and the Seventh Circuit upheld the dismissal. 133 F.3d at 546, 548.

Ms. Mullins knew that the more salary or wages she listed on the form, the less her chance of obtaining appointed counsel. To avoid that risk, she intentionally failed to disclose certain assets and income. In her response brief, Ms. Mullins focuses on her omissions regarding the two properties and her claimed ignorance about intestate succession, mortgages, and deeds. I do not credit her explanations. Indeed, I find them to be carefully calculated fabrications. Ignored is Ms. Mullins's misrepresentations regarding her almost $20,000 in wages from Hallmark. Her vacillating and implausible excuses are not credible. She claimed that she read each question in the form as carefully as she could. (Tr. 86). Then of course, she testified that she did not read the form very carefully, that she did not understand the questions and that she was upset. The excuses were many and varied. None of them rang true.

The IFP forms clearly and unambiguously asks questions in plain English on a form designed for use by non-lawyers. *Roberts v. Rest Haven Cent.*, 2007 WL 489156, *3 (N.D.Ill. 2007). The evidence at the hearing was that Ms. Mullins was a sophisticated individual who was two hours short of a college degree and whose successful completion of complicated courses in math and science belied her claims of confusion and lack of understanding. She is at least as sophisticated as the rest-home worker in *Roberts*, 2007 WL 489156, *3 where the court did not credit the excuse that the applicant was confused and had no one to help her complete the form; the food service worker in

21

*Eleby v. Unilever Food Solutions*, 2006 WL 644022, \*2 (N.D.Ill. 2006), where the court did not credit the explanation that the applicant who omitted $7000 of bank deposits made "an honest mistake" and "did not realize" what the question meant; or the salesperson in *Moreland v. Hu-Friedy Mfg. Co.*, 1997 WL 543066, \*3 (N.D.Ill. 1997) where the court did not credit the plaintiff's story that she did not understand the IFP application.

What is perhaps most distressing about Ms. Mullins's presentation and her conduct is the dramatic contrast between her professed morality and the immorality of her behavior in this case. When the need arose for Ms. Mullins to account for misrepresentations on her IFP forms, she invoked an ill-defined and self-serving "morality." Yet, morality was no impediment to her repeated lies under oath on multiple income tax returns. Morality was no impediment to her intentionally excluding almost $20,000 in wages and then falsely testifying under oath at the hearing about that exclusion. Nor was morality an impediment to fabricating at the hearing whatever excuse was thought necessary and expedient. In short, it would tax credulity beyond the breaking point to credit Ms. Mullins's implausible and vacillating excuses.

## CONCLUSION

Perjury is a fraud on the court. It strikes at the heart of the integrity of the judicial system and is incompatible with the values underlying any system of justice. *See United States v. Mandujano*, 425 U.S. 564, 576 (1976); *United States v. Kennedy*, 372 F.3d 686, 695 (4th Cir. 2004). It is no more acceptable in the context of cases like this than it is in any other setting. Indeed, it can be argued that "[n]o fraud is more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251. (1944)(Roberts, J., dissenting). What Ms. Mullins did qualifies as a form of that subversion. *Cf. Allen*, 317 F.3d at 703.

The disposition of this case (and others in which the plaintiff has intentionally falsified an IFP application and affidavit) is governed by Dewey's insight that: "Liability is the beginning of responsibility. The individual is held accountable for what he has done in order that he may be responsive in what he is going to do." Only thus do people gradually "learn by dramatic imitation to hold themselves accountable, and liability becomes a voluntary deliberate acknowledgment that deeds are our own, that their consequences from us." John Dewey, *Morals and Conduct*, in Man and Man: The Social Philosophers. 484-485 (J. Cummins and R. Linscott Ed. 1954).

The defendant's motion to dismiss [#43] is GRANTED, and the case is dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(A). The court wishes to thank John Zimring for his services on behalf of Ms. Mullins.

ENTERED:

UNITED STATES MAGISTRATE JUDGE

DATE: 9/7/07

23